# United States Court of Appeals for the Federal Circuit

2006-1550

OLE K. NILSSEN
and GEO FOUNDATION, LTD.,

Plaintiffs-Appellants,

v.

OSRAM SYLVANIA, INC.
and OSRAM SYLVANIA PRODUCTS, INC.,

Defendants-Appellees.

Paul M. Smith, Jenner & Block LLP, of Washington, DC, argued for plaintiffs-appellants. With him on the brief were Sam Hirsch and Caroline Lewis Wolverton; and Harry Roper, Raymond N. Nimrod, and Jonathan Hill, of Chicago, Illinois. Of counsel was Aaron A. Barlow.

Brian D. Sieve, Kirkland & Ellis LLP, of Chicago, Illinois, argued for defendants-appellees. With him on the brief were Garret A. Leach, Kal K. Shah, and Serena J. Gondek; and Christopher Landau, of Washington, DC.

Appealed from: United States District Court for the Northern District of Illinois

Judge John W. Darrah

# United States Court of Appeals for the Federal Circuit

2006-1550

OLE K. NILSSEN and GEO FOUNDATION, LTD.,

Plaintiffs-Appellants,

v.

OSRAM SYLVANIA, INC. and OSRAM SYLVANIA PRODUCTS, INC.,

Defendants-Appellees.

—————————————————

DECIDED: October 10, 2007

—————————————————

Before MAYER and LOURIE, <u>Circuit Judges</u>, and LINARES, <u>District Judge</u>.[*]

LOURIE, <u>Circuit Judge</u>.

Ole K. Nilssen and the Geo Foundation, Ltd. (collectively, "appellants") appeal from the judgment of the United States District Court for the Northern District of Illinois in favor of Osram Sylvania, Inc. and Osram Sylvania Products, Inc. (collectively, "Osram") holding fifteen patents issued to Nilssen and exclusively licensed to the Geo Foundation unenforceable for inequitable conduct. Because the district court did not abuse its discretion, we affirm the court's entry of judgment of unenforceability.

---

[*] Honorable Jose L. Linares, District Judge, United States District Court for the District of New Jersey, sitting by designation.

BACKGROUND

Nilssen is the inventor on a large number of patents related to electrical lighting products. At issue in this appeal are fifteen of his patents, the first eleven allegedly infringed by Osram and the last four withdrawn shortly before trial: U.S. Patents 4,857,806 ("the '806 patent"); 5,164,637 ("the '637 patent"); 5,233,270 ("the '270 patent"); 5,343,123 ("the '123 patent"); 5,402,043 ("the '043 patent"); 5,416,386 ("the '386 patent"); 5,432,409 ("the '409 patent"); 5,479,074 ("the '074 patent"); 5,481,160 ("the '160 patent"); 5,510,680 ("the '680 patent"); and 5,510,681 ("the '681 patent") (collectively the "patents in suit"); and 4,677,345 ("the '345 patent"); 5,047,690 ("the '690 patent"); 5,189,342 ("the '342 patent"); and 5,341,067 ("the '067 patent"). The patents relate to compact fluorescent light bulbs and to ballasts for gas discharge lamps such as fluorescent light bulbs. A ballast converts the low frequency alternating current power provided by a utility to high frequency alternating current power necessary for the operation of gas discharge lamps.

After initially relying on attorneys to prosecute his patents, in 1983 Nilssen began prosecuting his own patent applications, including those resulting in the patents in suit, because he felt that his understanding of the subject matter was better than that of any attorney. Nilssen was sufficiently knowledgeable of patent law and practice to cite the Manual of Patent Examining Procedure ("MPEP"), patent statutes and regulations, and case law during prosecution of his patent applications.

Nilssen established the Geo Foundation as a not-for-profit charitable organization in the Cayman Islands in 1998. Since June 2000, the Geo Foundation has been the exclusive licensee of Nilssen's patents. Prior to that date, Nilssen licensed at least

some of the patents in suit directly to Philips Electronics North America Corp. ("Philips"). Apparently, that license was canceled or revoked, and Geo began sublicensing those patents to Philips following the execution of its exclusive license agreement with Nilssen. The Geo Foundation receives all licensing revenue from the patents and any damages awards or settlements resulting from lawsuits to enforce the patents. It pays all litigation costs associated with those lawsuits, and it pays Nilssen twenty-five percent of its gross income.

Appellants sued Osram in 2000 alleging that electronic ballasts manufactured and sold by Osram infringed eleven of Nilssen's patents. Among the defenses asserted by Osram was that Nilssen had engaged in inequitable conduct in the procurement of the patents. The district court held a six-day bench trial on Osram's inequitable conduct defenses.

First, the court determined that Nilssen's submission of two affidavits from Dale Fiene, one during reexamination of the '345 patent and one during examination of the application that led to the '690 patent, in support of the patentability of claims rejected by the examiner constituted inequitable conduct because the affidavits failed to disclose Fiene's personal and professional association with Nilssen and Fiene's financial interest in Nilssen's patents. However, the court found that the reference to the '345 patent in the description of the prior art in the '270 and '681 patents and the fact that the three patents share a common parent application did not demonstrate sufficient relatedness among the three patents for the inequitable conduct during prosecution of the '345 patent to also render the '270 and '681 patents unenforceable under what the court referred to as the "doctrine of infectious unenforceability."

Second, the district court considered whether Nilssen's incorrect payment of small entity maintenance fees for the patents in suit constituted inequitable conduct. Nilssen entered into a Compact Fluorescent Lamp Agreement (the "CFLA") with Philips, effective December 7, 1995. The CFLA provided as follows (emphasis added):

> Nilssen <u>expects to offer</u> CFL manufacturers a preferential running royalty rate under his CFL patents for a limited time period starting the first quarter of 1996. Nilssen and Philips agree that Nilssen <u>will offer</u> and Philips <u>will take</u> a standard license from Nilssen under his CFL patents at the preferential rate provided that no royalties or payments will accrue under such license until Nilssen has licensed one CFL competitor having at least 10% Dollar share of the U.S. market for CFL's.

The court found that the CFLA covered the '806, '637, '270, '123, '680, and '681 patents. Nilssen also entered into a Patent License Agreement ("PLA") with Philips, effective January 1, 1996. The court found that the PLA covered the '806, '637, '043, '386, '409, '074, '160, '680, and '681 patents. Because the court found that these agreements created a license or an obligation to license all of the patents in suit, and Philips had more than 500 employees at all relevant times, the court concluded that Nilssen was obligated to pay large entity maintenance fees on all the patents in suit after December 7, 1995, the date of the CFLA. The court also found that Nilssen had made twenty-one improper small entity payments, including at least one for each patent in suit, compared with eight proper large entity payments. The court did not credit Nilssen's explanation that he did not believe that large entity payments were required for the patents once they were licensed to the nonprofit Geo Foundation in 2000. The court thus concluded that all of the patents in suit were unenforceable for inequitable conduct in failing to pay large entity maintenance fees.

Third, the court found that Nilssen had intentionally misclaimed an effective priority date of March 20, 1978, in the '637, '043, '386, '409, '160, '680, and '681 patents. The court found that the statutory copendency and/or cross-reference requirements were not satisfied for each of these patents. The court found the false claims material because they allowed Nilssen to potentially avoid prior art. The court based its finding of intent in part on two letters Nilssen sent to a customer, Advance Transformer Co., stating that it might be difficult to obtain effective patent protection for some parts of a new ballast design that might "be considered as representing known art." The court thus concluded that the '637, '043, '386, '409, '160, '680, and '681 patents were unenforceable for inequitable conduct based upon the claims of false effective priority dates.

Fourth, the court considered whether Nilssen's failure to disclose to the examiner ongoing litigation with Motorola rendered some of the patents unenforceable. Nilssen filed a lawsuit against Motorola alleging infringement of six patents on October 19, 1993. Motorola denied infringement, claiming invalidity for anticipation, obviousness, and failure to observe the requirements of 35 U.S.C. § 112. Those claims were dismissed without prejudice on July 23, 1996. A new lawsuit was filed against Motorola alleging infringement of the same six patents plus nine additional Nilssen patents on September 3, 1996. All of the patents involved in those suits pertained to the same general subject matter—electronic ballasts—claimed in the patents in suit. The applications leading to the '123, '043, '386, '409, '074, '160, '680, and '681 patents were pending during the time of the Motorola suits, but Nilssen failed to inform the examiner of the litigation. The court found that Nilssen intended to mislead the United States

Patent and Trademark Office ("PTO") and did not credit Nilssen's testimony that he was unaware of the duty to disclose information concerning the ongoing litigation to the PTO. The court thus concluded that the '123, '043, '386, '409, '074, '160, '680, and '681 patents were unenforceable for inequitable conduct for failing to report the existence of the Motorola litigation to the PTO.

Fifth, the court concluded that Nilssen had engaged in inequitable conduct in the prosecution of the '342 patent and the '067 patent as well as the '806, '043, and '681 patents by failing to identify to the PTO relevant prior art of which he had knowledge. However, the court found that the "descendant relationship" of the '123, '043, '386, '409, and '160 patents to the '342 patent did not render them unenforceable through what it referred to as the "doctrine of infectious unenforceability."

Finally, the court rejected Osram's argument that each of the patents in suit should be held unenforceable under the doctrine of unclean hands.

Appellants timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

Each of the issues on appeal to this court concerns a determination that a subset of the patents in suit is unenforceable for inequitable conduct. Prior to our review of the individual allegations, we therefore lay out the general standards for reviewing a holding of inequitable conduct.

> We review a district court's ultimate decision on a claim of inequitable conduct for an abuse of discretion and its threshold findings on materiality and intent for clear error. An abuse of discretion occurs when (1) the court's decision is clearly unreasonable, arbitrary, or fanciful, (2) the court's decision is based on an erroneous construction of the law, (3) the court's factual findings are clearly erroneous, or (4) the record contains no

evidence upon which the court rationally could have based its decision. Under the clear error standard, the court's findings will not be overturned in the absence of a "definite and firm conviction" that a mistake has been made.

Impax Labs., Inc. v. Aventis Pharm. Inc., 468 F.3d 1366, 1375 (2006) (citations omitted).

> Applicants for patents have a duty to prosecute patent applications in the Patent Office with candor, good faith, and honesty. A breach of this duty- including affirmative misrepresentations of material facts, failure to disclose material information, or submission of false material information- coupled with an intent to deceive, constitutes inequitable conduct. In determining whether inequitable conduct occurred, a trial court must determine whether the party asserting the inequitable conduct defense has shown by clear and convincing evidence that the alleged nondisclosure or misrepresentation occurred, that the nondisclosure or misrepresentation was material, and that the patent applicant acted with the intent to deceive the United States Patent and Trademark Office.

Honeywell Int'l Inc. v. Universal Avionics Sys. Corp., 488 F.3d 982, 999 (Fed. Cir. 2007) (citations omitted).

## I. Patents No Longer In Suit

On appeal, appellants argue that the district court erred by ruling four patents no longer asserted against Osram—the '345 patent, the '690 patent, the '067 patent, and the '342 patent—unenforceable. Appellants argue that the district court should have first considered whether there was a sufficiently close relationship between the patents in suit and the patents that Osram alleged were unenforceable due to inequitable conduct before considering whether the patents not in suit were unenforceable for inequitable conduct. In addition, appellants argue that in the case of the '345 and '690 patents, the Fiene affidavit was not material because the examiner in those applications did not request an affidavit from a disinterested party and Osram failed to demonstrate any error in the affidavit. Osram responds that a patent must be found unenforceable

<u>before</u> turning to the question whether it taints other related patents. Osram then argues that it would be "impractical" for the district court to evaluate the issues in the order suggested by appellants, but fails to elaborate on that theory. Osram does not directly address the materiality of the Fiene affidavit.

We conclude that the district court did not abuse its discretion in holding that Nilssen engaged in inequitable conduct with respect to the '345 and '690 patents by submitting affidavits by Fiene in support of patentability, including points of distinction over prior art patents, without informing the examiner of the affiant's relationship to Nilssen. Even though the examiner did not raise a question concerning any such relationship, it is material to an examiner's evaluation of the credibility and content of affidavits to know of any significant relationship between an affiant and an applicant, <u>see</u> <u>Ferring B.V. v. Barr Labs., Inc.</u>, 437 F.3d 1181, 1187-88 (Fed. Cir. 2006); failure to disclose that relationship violated Nilssen's duty of disclosure. As for the '067 and '342 patents, appellants do not contest the materiality of the prior art references the district court found were intentionally withheld during their prosecutions. Because inequitable conduct with respect to one or more patents in a family can infect related applications, <u>see, e.g.</u>, <u>Consolidated Aluminum Corp. v. Foseco Int'l Ltd.</u>, 910 F.2d 804 (Fed. Cir. 1990), we find no abuse of discretion in the district court's holding the '345, '690, '067, and '342 patents unenforceable prior to determining whether the inequitable conduct related to each of those four patents should render additional related patents unenforceable as well. Trial judges are entitled to arrange the priority of issues in a manner that they consider efficient. <u>Cf.</u> <u>R.R. Dynamics, Inc. v. A. Stucki Co.</u>, 727 F.2d 1506, 1515 (Fed. Cir. 1984) ("District courts have broad authority and discretion in

controlling the conduct of a trial."). Our conclusion to affirm the trial court's holding with respect to the four patents is further supported by the fact that these four patents were withdrawn from the suit only shortly before trial at the last minute. It was not an abuse of discretion for the district court, when these patents were sued upon and maintained in the suit up until just before trial, to hold these four patents unenforceable, even though it did not include them in its entry of judgment.

## II. Improper Payment of Small Entity Maintenance Fees

Different facts are relevant to the consideration of the appropriate maintenance fee payments and Nilssen's intent for the time period prior to late 2000 when Nilssen made the agreements concerning his patents and the following time period when Geo began to license Nilssen's patents to others. We therefore treat these two time periods separately.

## A. Payments Through Late 2000 (Nilssen Licensing Period)

Certain entities, including "independent inventors," are entitled to pay reduced patent maintenance fees, see 35 U.S.C. § 41(h)(1). The relevant PTO regulation defines "independent inventors" as "any inventor who (1) has not . . . licensed, and (2) is under no obligation under contract or law to . . . license, any rights in the invention to any person who could not likewise be classified as an independent inventor . . ., or to any concern which would not qualify as a small business concern or a nonprofit organization," see 37 C.F.R. § 1.9(c) (July 1, 2000).

Appellants argue that the CFLA did not constitute such an obligation to license, so that it did not remove Nilssen from the definition of an independent inventor entitled to pay small entity maintenance fees for the patents included in the agreement. The

payments to which this argument applies are the issuance fee for the '681 patent in December 1997, and the four-year maintenance payment for the '270 patent in January 1997. The only patents in suit covered by the CFLA, but not included in the PLA, are the '270 and '123 patents, and no payment was due for the '123 patent during the time period in question. Although it was covered by both the CFLA and the PLA, the issuance fee was paid for the '681 patent in late December of 1995 after execution of the CFLA but before execution of the PLA. Osram responds that the CFLA created an obligation to license Philips within the plain meaning of the regulation, and that whether the obligation had "vested" or not is irrelevant.

We conclude that the district court did not abuse its discretion in holding that the CFLA precluded Nilssen from being eligible to pay small entity fees on the patents covered by that agreement. Interpretation of a contract is a question of law that we review de novo. Carnes Co. v. Stone Creek Mech., Inc., 412 F.3d 845, 853 (7th Cir. 2005); Cyrix Corp. v. Intel Corp., 77 F.3d 1381, 1384 (Fed. Cir. 1996). This court reviews a district court's interpretation of agency regulations without deference. Shockley v. Arcan, Inc., 248 F.3d 1349, 1357 (Fed. Cir. 2001). The clear import of the PTO regulation benefiting small entities is to ensure that inventors currently receiving a revenue stream from or reasonably expected to receive a revenue stream from an entity that is not itself entitled to pay small entity fees should not be able to claim that right. While the CFLA first uses the future tense to describe a possible license agreement, stating that Nilssen "will offer" and Philips "will take" a license, it follows up that sentence by providing that "no royalties or payments will accrue under such license until Nilssen has licensed one CFL competitor," indicating that such a license was intended

to be a present one but that royalties would not accrue until other conditions were satisfied. We do not believe the district court erred when it interpreted that contract to mean that Nilssen had in effect licensed Philips on December 7, 1995. In fact, the PLA, which unequivocally was a license, was executed less than one month after the CFLA, covering most of the same patents as the CFLA. Obviously the parties considered the CFLA to be at least an agreement, or obligation, to license.

Appellants argue that the payment of small entity maintenance fees for the '806 patent in February of 1997 and for the '160 patent in June of 1999 were simple oversights by Nilssen. Appellants point to the fact that Nilssen made eight large entity maintenance fee payments for seven of the patents in suit between 1996 and 2000 to demonstrate that Nilssen paid large entity fees when he believed they were required. Appellants add that the title of the '806 patent, "Self-Ballasted Screw-In Fluorescent Lamp," makes it appear upon a superficial examination that the patent relates to a CFL rather than a ballast design that falls within the scope of the PLA. Osram responds that the district court made credibility findings regarding Nilssen's knowledge of the patents covered by the agreements with Philips and that appellants' argument asks this court to overrule the district court's credibility findings, despite the substantial deference we give to such findings.

While a misrepresentation of small entity status is not strictly speaking inequitable conduct in the prosecution of a patent, as the patent has already issued if maintenance fees are payable (excepting an issue fee), it is not beyond the authority of a district court to hold a patent unenforceable for inequitable conduct in misrepresenting one's status as justifying small entity maintenance payments. Ulead Sys., Inc. v. Lex

Computer & Mgmt. Corp., 351 F.3d 1139, 1146 (Fed. Cir. 2003). The district court found clear and convincing evidence of "Nilssen's obvious intent to mislead." The court also found Nilssen's exculpability statements "not credible." While an opposite conclusion could have been reached, it is not the function of a court of appeals to override district court judgments on close issues, where credibility findings have been made. Thus, we affirm the district court's holding that the '681, '270, '806, and '160 patents are unenforceable.

B. Payments After Late 2000 (Geo Licensing Period)

Appellants argue that the district court's conclusion that Geo could not be considered a not-for-profit organization is entirely unsupported because the court cited no law in support of its conclusion and Nilssen gave unrebutted testimony that he relied upon the advice of competent counsel that Geo was a proper nonprofit entity. Appellants thus argue that Nilssen's explanation for paying small entity maintenance fees for the patents licensed by Geo was reasonable. Because the PTO regulations explicitly excluded an inventor who had licensed his patents to a large company from the definition of an "independent inventor" eligible to pay small entity fees, see 37 C.F.R. § 1.9(c) (July 1, 2000), but did not explicitly state the same exclusion for a nonprofit organization, see 37 C.F.R. § 1.9(e) (July 1, 2000), Nilssen testified that he believed that a nonprofit organization that licensed patents to a large company was still eligible to pay small entity fees. Appellants further argue that the fact that the PTO changed the regulation for nonprofits in late 2000, specifically noting the confusion created by the prior inconsistent definitions, to explicitly exclude nonprofits licensing to large companies, see 37 C.F.R. § 1.27(a)(3)(i), demonstrates the prior ambiguity of the

regulation. Nilssen also stated that he was simply not aware of the rule change in 2000 because he had continued to rely on a pre-2000 version of the MPEP as his primary reference. In response, Osram argues that the district court did not find Nilssen's testimony credible, particularly as to whether he was unaware of the clarification of the regulation defining a nonprofit organization. Osram also states that the district court properly found Geo to be a "sham," but provides no support for that conclusion.

We agree with Osram that the district court did not abuse its discretion in finding all of the patents in suit unenforceable because Nilssen claimed small entity status after the date Geo licensed[1] the patents in suit. The PTO relies on applicants to accurately represent their fee status, and it is for a fact-finder to evaluate whether any intentional misrepresentations occur in doing so. The district court did not credit Nilssen's testimony that he was aware of the pre-2000 fee regulations, but yet not aware of the clarification of the relevant regulation in 2000. While the PTO's own admission of ambiguity in the regulation prior to 2000, see Changes to Implement the Patent Business Goals, 65 Fed. Reg. 54613 (September 8, 2000), may have made a belief that nonprofits were subject to different treatment than independent inventors reasonable during that time frame, we see no clear error in the district court's finding that it was not believable that Nilssen was aware of a specific alleged ambiguity in his favor but ignorant of a change that eliminated the alleged ambiguity shortly thereafter.

---

[1] After reviewing the record before us, it is not clear which of the patents in suit were licensed by Geo or to which companies Geo granted licenses following the execution of the Exclusive Master License Agreement with Nilssen. For purposes of this analysis, however, we will assume that the district court found all small entity payments for the patents in suit after June of 2000 to be improper because Geo had licensed the patents to at least one company that did not qualify for small entity status. Appellants do not argue that some of the patents were not licensed to large companies.

We therefore affirm the district court's decision finding that all of the patents in suit are unenforceable due to inequitable conduct in improperly claiming small entity status.

### III. Misclaimed Priorities

Appellants argue that our case law establishes a rule that an improper claim to an earlier priority date is only material to patentability if the applicant asserts that earlier date to overcome or exclude prior art. Appellants also argue that it was clear error for the district court to conclude that Nilssen intended to mislead the examiner based upon two letters sent to Advance Transformer Co., a division of Philips, near the time when Nilssen began to cross-reference earlier patent applications. Osram responds that a misrepresentation may still be material even in the absence of reliance by an examiner. Osram also argues that the district court's finding of intent was reasonable in light of Nilssen's change in patent application drafting practice to recite the alleged application histories, together with the two letters indicating a concern about obtaining effective patent protection for newly developed designs.

We agree with Osram that the district court's conclusion that the claims to priority in the '637, '043, '386, '409, '160, '680, and '681 patents constituted inequitable conduct was not an abuse of discretion. It is not necessary for a holding of inequitable conduct that an examiner rely on a claim for priority or that entitlement to an earlier priority be expressly argued in order to overcome prior art. Nilssen recited in his various patent applications paternity from earlier applications, the obvious purpose of which is to be able to assert a claim for priority over intervening publications or other patent-defeating occurrences if needed. The district court found, and appellants are not contesting, that

the recitation of application histories did not comply with the applicable 35 U.S.C. § 120 requirements, and certain applications were thus not entitled to earlier priority dates.

A claim for priority is inherently material to patentability because a priority date may determine validity, whether an issue arises in prosecution or later in court challenges to validity. While an active misrepresentation made during prosecution in order to avoid prior art is no doubt "highly material," see Li Second Family Ltd. P'shp v. Toshiba Corp., 231 F.3d 1373, 1380 (Fed. Cir. 2000), a misrepresentation that would not have immediately affected patentability is still material, see Digital Control, Inc. v. Charles Mach. Works, 437 F.3d 1309, 1318 (Fed. Cir. 2006). In addition, we cannot say that the district court's finding that Nilssen's disclosures that his patents were derived from earlier ones were intentional misrepresentations was clearly erroneous given that the district court made credibility determinations. Nilssen's contemporaneous letters stating his concern about securing patent protection for new designs in light of unspecified prior art supported the court's finding. We therefore affirm the district court's conclusion that the '637, '043, '386, '409, '160, '680, and '681 patents are unenforceable for inequitable conduct in misclaiming priority.

IV. Failure to Disclose the Motorola Litigation

Appellants argue that the district court failed to conduct an adequate comparison of the "subject matter" of the patents in the Motorola litigation with the claims of the patents in suit to determine whether Nilssen violated MPEP § 2001.06(c)[2] in failing to

---

[2]   Section 2001.06(c) of the MPEP (August 1993) provides as follows:

Where the subject matter for which a patent is being sought is, or has been involved in litigation, the existence of such litigation and any other material information arising therefrom must be brought to the attention of

bring the litigation to the attention of the examiner. Appellants also argue that even if the existence of the litigation could be considered material to the examination of the patents, Motorola asserted only generalized allegations of invalidity in its case, so the degree of materiality of its litigation to the examination of Nilssen's patent applications was very low. Appellants add that the only evidence of intent to support the district court's decision was its discrediting of Nilssen's testimony that he was unaware of the relevant rule. Osram responds that Nilssen accused the same type of product of infringing his patents in the Motorola litigation as he accuses in this case, that three of the patents in suit are direct descendents of patents asserted in the Motorola litigation, and that all of the patents in suit and the patents asserted in the Motorola litigation relate to the same general subject matter. Osram also argues that the district court was correct to find the litigation highly material and that § 2001.06(c) was adjacent in the MPEP to provisions with which Nilssen was admittedly familiar.

We conclude that the district court did not abuse its discretion in holding eight patents unenforceable for inequitable conduct based upon Nilssen's failure to disclose the Motorola litigation. It is clear from the language of § 2001.06(c) that the existence of the litigation itself is material information that an examiner needs to have. It is important because it signals the examiner that other material information relevant to patentability may become available through the litigation proceedings. The PTO obviously considers such information material and there is no basis for us to conclude otherwise. We

the Patent and Trademark Office; such as, for example, evidence of possible prior public use or sales, questions of inventorship, prior art, allegations of "fraud," "inequitable conduct," and "violation of duty of disclosure." Such information might arise during litigation in, for example, pleadings, admissions, discovery including interrogatories, depositions, and other documents, and testimony.

therefore affirm the district court's holding that the '123, '043, '386, '409, '074, '160, '680, and '681 patents are unenforceable for inequitable conduct in failing to disclose the Motorola litigation.

## V. Failure to Disclose Prior Art

Appellants argue that the district court's finding that U. S. Patent 4,266,134 (the "Franke patent") was highly material to the prosecution of the '806 patent was clearly erroneous because the claims of the '806 patent referenced by the district court require a "gas discharge lamp" and a "screw base" small enough to fit a standard lamp socket whereas the Franke patent concerns an X-ray device. Appellants further argue that the PTO Board of Patent Appeals and Interferences found during the prosecution of a different Nilssen patent application that the Franke patent does not reasonably suggest connecting its inverter circuitry to a gas discharge lamp and called this oversight by the examiner "glaring." Next, appellants argue that the district court failed to explain how Nilssen should have known of the materiality of the reference allegedly withheld during prosecution of the '681 patent—U. S. Patent 4,251,752 (the "Stolz patent")—or the references allegedly withheld during prosecution of the '043 patent—U. S. Patents 4,045,711 (the "Pitel patent"); 4,461,980; and 4,053,813 (the "Kornrumpf patent")—and thus acted with intent to withhold them. Osram responds that the district court was entitled to rely on testimony from its expert that inverters are not limited to a particular type of application and that one of ordinary skill in the art would apply the teachings of the Franke patent to a gas discharge lamp. Osram also points to the high degree of materiality of the references and the fact that each was repeatedly cited to Nilssen by PTO examiners during the prosecution of various of his patents.

We agree with Osram that the district court's findings regarding the references withheld by Nilssen were not clearly erroneous. "Information is material if there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." Honeywell, 488 F.3d at 1000 (internal quotations omitted). The fact that Nilssen had repeatedly cited or had cited to him the prior art references in question makes it highly likely that a reasonable examiner would have wanted to consider the information in the withheld patents in determining patentability. Given that these material references were repeatedly before Nilssen, and his failure to offer any good faith explanation for withholding them other than mere oversight, we find an inference that Nilssen intended to deceive the PTO not unreasonable. We therefore affirm the district court's conclusion that the '806, '043, and '681 patents are unenforceable for inequitable conduct in the withholding of material prior art references during their prosecution.

A few closing comments are in order. Each of the issues on which the district court found inequitable conduct generated defenses by Nilssen that were not per se unreasonable when considered in isolation. The CFLA was not beyond an interpretation contrary to what the district court adopted. Nilssen did pay some fees that were large entity fees. Failure to cite the Motorola litigation to the PTO may have been an oversight, as perhaps failure to cite prior art might have been. Perhaps Nilssen did not expressly assert an unjustified earlier priority date to obviate prior art.

However, this case presents a collection of such problems, which the district court evaluated thoroughly and considered, including making credibility findings, and it concluded that the record and testimony indicated repeated attempts to avoid playing

fair and square with the patent system. Mistakes do happen, but inadvertence can carry an applicant only so far. Thus, we cannot find that the court's holding of unenforceability was an abuse of discretion. Perhaps some of the errors were attributable to Mr. Nilssen's representing himself during the prosecution of his patents. It surely was true that he knew more about the subject matter of his inventions than most, or even any, attorney. That is almost always the case with an invention, particularly one dealing with complex subject matter. However, the patent process is a complicated one, one that requires both technical and legal credentials in order to effectively prosecute patents for inventors. The same credentials are generally required to prosecute patents on one's own inventions. Mr. Nilssen, while apparently gaining considerable knowledge of the patenting process, thought he didn't need professional patent help. The result of this case, regrettably, proves that he was wrong.

## CONCLUSION

For the reasons stated, we affirm the district court's holding that the '806, '637, '270, '123, '043, '386, '409, '074, '160, '680, '681, '345, '690, '067, and '342 patents are unenforceable.

## AFFIRMED